**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-594 (TSC)** |
| **JOSHUA DILLON HAYNES** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua Dillon Haynes to 36 months' incarceration, which is the higher-end of the guideline range calculated by the Probation Office,[1] 3 years of supervised release, $2,000 restitution, and a mandatory $200 special assessment.

## I.     INTRODUCTION

The defendant, Joshua Dillon Haynes, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million

---

[1] As noted below, the parties calculated a different guideline range because the estimate of the defendant's criminal history category was II, and not III, as correctly calculated by the Probation Office. The difference in criminal history category changed the estimated sentencing guideline range from a range of 27 to 33 months, to 30 to 37 months.

1

dollars in losses.[2] Haynes was inside the Capitol for approximately 30 minutes, entered into sensitive spaces inside the Capitol, made numerous posts on social media regarding his intent to stop the proceedings, and formed part of a mob outside the Capitol, which terrorized members of the news media and destroyed their equipment. Haynes also showed a blatant disregard for government property, as he assisted other rioters in forcibly removing an air conditioning unit from a guard station at the Capitol. Haynes also instructed a colleague to delete evidence regarding Haynes's participation in the riot, when Haynes knew he was being investigated.

Haynes was charged in an eight-count superseding indictment in May 2022 and pled guilty to two counts of the indictment on October 28, 2022, specifically, to a violation of 18 U.S.C. § 1512(c)(2), obstruction of official proceedings, and 18 U.S.C. § 1363, destruction of property in the territorial jurisdiction of the United States. The government recommends that the Court sentence Haynes to 36 months' incarceration, which is within the advisory Guidelines range of 30-37 months. A 36-month sentence reflects the gravity of Haynes's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    Haynes's Role in the January 6, 2021 Attack on the Capitol

Haynes entered the Capitol through the Senate Wing Doors at approximately 2:50 p.m. on January 6, 2021. Haynes sent a text message on January 6, 2021 to an associate (Associate

---

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

#1) and stated, "I'm inside Congress he stormed inside." A short time later, Haynes sent the text, "we *."   HAYNES then sent the below image (Image 1) to his associate, depicting himself inside the office of a United States Senator.

**Image 1**



Haynes then sent the below images (Images 2A and 2B) to another associate ("Associate 2") along with the text, "We are inside the Congress the Senate we stormed inside."

**Images 2A and 2B**

 

Haynes and Associate 1 exchanged additional texts about what was being reported by the live news about the events occurring at the U.S. Capitol.   Haynes sent Associate 1 the text, "I'm inside." Associate 1 sent Haynes the text messages, "Breaking windows to get in" and "The People did." Haynes replied, "I know I crawled through the window." Associate 1 replied, "Erase this." Later that day, Haynes asked Associate 1, "What did Congress do did they certify Joe Biden?" and Associate 1 responded, "a Fri [sic] said he gave a speech all I know." Haynes then sent Associate 1 the text, "No because we storm inside they stop debating and said the army is going to have to do it decide who's president." Haynes left the Capitol through the Senate Wing Doors at approximately 3:20 p.m, after spending approximately 30 minutes inside the Capitol.

**Image 3**



After leaving the Capitol building, Haynes assisted in damaging property on the Capitol grounds. Specifically, Haynes assisted two other individuals in forcibly removing an air-conditioning unit from a building outside the United States Capitol and dropping the air-conditioning unit to the ground, as shown in images 4A and 4B.

**Images 4A and 4B**

 

Before leaving the Capitol grounds, Haynes participated in the assault on the media staging area at the northeast side of the U.S. Capitol at approximately 5 p.m. on January 6, 2021. Shortly before 5 p.m. on that date, a large crowd made its way to the media staging area that was set up outside the northeast corner of the U.S. Capitol, on U.S. Capitol Grounds. As individuals moved past metal barricades that had been set up around the staging area, media members were forced to flee the area before recovering all of their cameras and associated equipment. Numerous members of the crowd began to destroy the equipment, including cameras, tripods, lights, shades, and remote broadcasting equipment that belonged to various media outlets. Numerous members of the crowd yelled inflammatory rhetoric against members of the media. One member of the media who was forced to flee estimated that the equipment from his particular news organization that was destroyed was valued at between $30,000 to $34,000.

6

Specifically, Haynes picked up and slammed down multiple pieces of equipment that belonged to media outlets. Haynes lifted and threw to the ground a light used by the media for live broadcasts.

**Image 5**



He also lifted and slammed to the ground what appeared to be a video camera fixed to a tripod.  After slamming the tripod on the ground, Haynes then stomped on the camera and picked it up and threw it onto a pile of other equipment.

Later on January 6, 2021, Associate 2 sent Haynes a text indicating another individual had "said dont [sic] be like antifa tearing stuff up."  Haynes replied to Associate 2, "ahhhh tooooo late," "broke lotsa stuff," "lol." Haynes then sent the below image (Figure 6) via text with the message, "We attacked the CNN reporters and the fake news and destroyed tens of thousands of dollars of their video and television equipment here's a picture behind me of the pile we made out

of it."   This image shows Haynes standing in front of the destroyed equipment at the media staging area as described above.

**Image 6**



Following the text with the above image attached, Haynes sent the following texts to Associate 2: "They had to run away from us and leave all their equipment so we destroyed it," "i Kicked the fake news ass." Haynes then sent the texts: "ahhhhh I liked it too I have already seen a report of it and I am in the video destroying the stuff but I'm wearing a mask," "I had to keep my face covered," "I want to get busted for tearing up the nations capital [sic] and the fake news."   Haynes continued with the following texts to Associate 2: "Well back God we fucking stood up today that she will go down in history for thousands of years no one is ever storm the

capital [sic] like that," "I mean we broke down the doors and windows and just went the fuck in," "fight the cops push them back and went in there."

Following the riot on the Capitol, the FBI listed several suspects on their public website, including Haynes, who was identified as #203-AOM-A-D (with the AOM denominating "Assault on Media"). On February 14, 2021, Haynes sent the below image (Image 7) to Associate 2 via text, showing the FBI images of Photographs #203-AOM A-D that were posted on February 4, 2021. Haynes followed the image with the following texts: "erase immediately," "aom = assault on media."

**Image 7**



Associate 2 replied, "Damn." Then HAYNES sent the below image (Image 8) by text to Associate 2.

**Image 8**



**Consensual Pre-Arrest Interview with Haynes**

On June 14, 2021, FBI agents interviewed Haynes at his residence. Haynes was advised at the outset of the interview of the purpose and subject matter to be discussed during the interview, that he was not under arrest, and that he was free to end the interview at will. Haynes stated that he observed that some police officers were just waving people into the U.S. Capitol. Haynes stated that he did not personally participate in using force against law enforcement officers or in assaulting law enforcement officers, but he believes that those who did use force against law enforcement officers that day to stop the election from being stolen are "heroes." When asked what Haynes believed the purpose of the actions taken by those who stormed the U.S. Capitol was, he replied that he cannot speak for people individually, but he believed that the crowd of Trump supporters were trying to keep the country from being stolen by delaying the process of certifying the votes. Haynes stated that he did not believe anyone traveled to the U.S. Capitol that day with the intent to commit acts of violence.

Haynes was asked if he took part in attacking the media or destroying equipment belonging to media at the U.S. Capitol on January 6, 2021. Haynes stated that he was not comfortable answering that question.

Haynes provided consent for the interviewing agents to search his phone and his personal residence for evidence of Haynes's participation in the riots at the U.S. Capitol and for the clothing worn by the individual pictured in FBI Photograph #203-AOM A-D, to include a leather Harley Davidson jacket and black Nike sneakers with neon yellow/green detailing. Haynes stated that the agents would not find anything on his phone or in his home, but that the agents were welcome to search both. A search of the phone contents was conducted in Haynes's presence. The text messages, photos, videos and other images were searched. There were no text messages and/or text history on Haynes's phone. There were no images or photos of Haynes at the U.S. Capitol on the phone. Haynes was asked if he destroyed and/or deleted anything evidentiary on his phone regarding his participation in unlawful activity at the U.S. Capitol on January 6, 2021. Haynes stated that he did not.

Haynes escorted the interviewing agents around his home to search for the clothing worn by the individual pictured in FBI Photograph #203-AOM A-D. Haynes stated that he had never owned a leather Harley Davidson jacket. Haynes was advised that Agents had reviewed contents from a search warrant served on the carrier of his phone and found evidence that he once purchased a leather Harley Davidson jacket. Haynes told the interviewing Agents that he may have once owned a leather Harley Davidson jacket but that he had not owned one in a long time. When asked to elaborate on what he meant by a long time, Haynes advised that he once owned a Harley

Davidson motorcycle but laid it down on the road in front of his home years ago and totaled it. He has not owned any Harley Davidson clothing since that time. When asked what he did with the jacket, Haynes stated that he did not remember because it had been so long ago.

Haynes was asked if he had seen his FBI Photograph from the U.S. Capitol. Haynes falsely stated that he had not. While accompanying the interviewing agents on the search of his home, Haynes was shown FBI Photograph #203-AOM A-D and asked if he had a pair of shoes like the ones on the male pictured in the photographs. Haynes stated that he did not, nor had he ever owned a pair like them. Haynes was asked if there was a leather Harley Davidson jacket or pair of shoes that resembled the jacket and shoes worn by the male in FBI Photograph 203-AOM A-D in the home currently. Haynes stated that they were not in the home. Haynes was asked if he purposely destroyed and/or disposed of the jacket or the clothing and Haynes stated that he did not wish to answer the question. Haynes was asked if he, through an attorney, was asked to produce a jacket and shoes that resembled those worn by FBI Photograph #203-AOM A-D, would he be able to do so. Haynes stated that he would no longer be able to produce the items of clothing even if he wished to do so.

**Post-Arrest Conduct**

On July 1, 2021, Haynes was arrested in Covington, Virginia pursuant to a criminal complaint issued by a judge of this Court. He had his initial appearance before a judge of the United States District Court for the Western District of Virginia and was released on conditions. On July 8, 2021, Haynes appeared before a judge of this Court, where he was placed on the high-intensity supervision program.

On July 27, 2021, Haynes was arrested in Covington, Virginia, and charged with state law offenses of strangulation, malicious wounding, destruction of property, and assault and battery. As a result of that arrest, a judge of this Court revoked Haynes's bond on August 13, 2021, and he has been incarcerated since August 2021.

## III.    THE CHARGES AND PLEA AGREEMENT

On May 6, 2022, a federal grand jury returned a superseding indictment charging Haynes with 8 counts, including obstruction of proceedings, in violation of 18 U.S.C. § 1512(c)(2), and destruction of property in the territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1363. On October 28, 2022, Haynes was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

As noted in the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years imprisonment, a $250,000 fine, three years of supervised release, a fine, and a special assessment, for a violation of 18 U.S.C. § 1512(c)(2). The plea agreement erroneously noted that the maximum period of incarceration for a violation of 18 U.S.C. § 1363 was 20 years, instead of 5 years. The parties corrected the error at the plea hearing.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties and Probation Office calculated the combined offense level of the two counts of conviction as 17, as set forth below.

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |
| U.S.S.G. § 3C1.1 | Obstructing the Admin. Of Justice | +2 |
| | **Total** | **19** |

Count Two: 18 U.S.C. § 1363

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(D) | Loss amount: $15,000+ | 4 |
| | **Total** | **11** |

**Grouping:**

| | |
|---|---|
| U.S.S.G. 3D1.2(d) (offenses do not group) | |
| U.S.S.G. 3D1.4 (1.5 units) | 1 |

| | |
|---|---|
| **Combined Offense Level** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **17** |

*See* Plea Agreement at ¶¶ 5(A); PSR ¶¶ 36-59.

The parties calculated Haynes' criminal history category as II. Notwithstanding his 12 adult criminal convictions over the course of 21 years, the U.S. Probation Office calculated the defendant's criminal history as category III, which is the correct offense level. PSR ¶¶ 60-73.

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Haynes admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Under the plea agreement, Haynes acknowledged that a different criminal history category could be reached depending the U.S. Probation Office's findings. Plea Agreement at ¶5(B). Accordingly, based on the parties', and Probation Office's, calculation of Haynes' total adjusted offense level, after acceptance of responsibility, at 17, and with a criminal history category of III, not II, Haynes's Guidelines imprisonment range is 30 to 37 months' imprisonment. PSR ¶ 130.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

The Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Haynes's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Haynes's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 36 months imprisonment.

### B.  The History and Characteristics of the Defendant

As set forth in the Pre-Sentence Report, the defendant has a lengthy criminal history. Most recently, Haynes was convicted of several domestic violence-related charges, including a felony, to include unlawful wounding, assault and battery of a family member, and destruction of property, for which he received a term of 12 months imprisonment. In 2015, he was also convicted of assault and battery, resulting in a 12-month sentence of imprisonment, with 11 months suspended. He also sustained a series of convictions for reckless driving starting in 2000 (for which he did not receive any criminal history points). Haynes's history and characteristics support a substantial sentence of

15

incarceration in this matter. Indeed, the number of convictions, for which he did not receive criminal history points, is an aggravating factor for which the government is recommending a sentence at the higher end of the sentencing guideline range.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Haynes's criminal conduct, in obstructing the proceedings by entering the Capitol, becoming part of group of rioters who was intent on stopping the proceedings on that date, then participating in the destruction of property outside the Capitol, was the epitome of disrespect for the rule of law. Haynes's conduct is further aggravating because of the considerable amount of time he spent at the Capitol and Grounds, to include the 30 minutes inside the Capitol, as well as his assisting in physical destruction of government property after he left the Capitol Building, and destruction of the property of members of the media, while on Capitol Grounds later that afternoon. His statements minimizing his actions on January 6 to the Capitol further reflect the need for a significant sentence of imprisonment.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

The defendant has a history of disrespect for the law, and violence towards other persons. This history started in 2000, and has continued through his adult life, most recently culminating in multiple domestic-violence related convictions including a felony conviction in April 2022. The defendant should be credited with reaching a pre-trial resolution in this matter, but it does not detract from his destructive activities on January 6, and his intent to obstruct the proceedings on that date.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The following cases offer a basis of comparison to the sentence sought here for Haynes's conduct:

**United States v. Chansley, 21-CR-00003 (Judge Lamberth)**: The defendant carried an American flag tied to a pole with a sharp object at the tip and a bullhorn. The defendant climbed the media tower erected for the Inauguration, directly ahead of the police line holding the rioters back at the West front and entered the Capitol through a broken door. He went into the well of the Senate and sat in the vice-presidential seat. Chansley's guideline range was higher than Haynes's because he received the 8-point enhancement pursuant to 2J1.2(b)(1)(B). He received 41 months' imprisonment.

**United States v. Pruitt, 21-CR-00023 (Judge Kelly):** Pruitt was a member of the Proud Boys. He entered the Capitol grounds and headed towards the Upper West Terrace. He climbed a bike rack being used as a ladder to reach the stairs. He entered the Capitol and went to the Crypt. After 40 minutes in the Capitol, Pruitt left through a window. Pruitt's guidelines were higher than Haynes's guidelines because the enhancement under 2J1.2(b)(1)(B) was applied. Pruitt was sentenced to 55-months' imprisonment.

**United States v. Matthew Miller, 21-CR-00075 (Judge Moss)**: Miller pled guilty to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). As with the other two defendants, his guidelines were higher because the 8-point enhancement was applied. Miller encouraged rioters to violence, unleashed fire extinguisher contents onto officers, and threw a can of beer and batteries at officers.

The government recommended a sentence of 51-months' imprisonment, but the Court ordered him to serve 33 months' imprisonment.

There are other defendants, including *United States v. Christine Priola* (22-CR-00242-TSC), and *United States v. Michetti* (21-CR-00232-CRC), who are not comparable to Haynes. In those cases, the government also did not seek the 8-point enhancement, and thus, their guidelines for the § 1512(c)(2) conduct were similar to Haynes. However, neither of those defendants were also convicted of 18 U.S.C. § 1363, and neither defendant had the significant criminal history this defendant has accrued.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Haynes must pay $2,000 in restitution to the Architect of the

Capitol, which reflects in part the role Haynes played in the riot on January 6.[6] Plea Agreement at

¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused $2.2 million

in damages, a figure based on loss estimates supplied by the Architect of the Capitol in April 2022.

*Id.* Haynes's restitution payment must be made to the Clerk of the Court, who will forward the

payment to the Architect of the Capitol.

Since Haynes pleaded guilty to the 18 U.S.C. § 1363 offense and that was an "offense

against property," the court is required to impose restitution under the Mandatory Victim Witness

Restitution Act (MVRA). *See* 18 U.S.C. § 3663A (b)(1) (the order of restitution shall require that

the defendant pay an amount equal to the value of the property on the date of the damage, loss, or

destruction, if replacement of the property is not possible, practical, or adequate).

Given the mandatory nature of the MVRA, the Court must also award restitution to the

media victims. For loss caused by multiple persons:

> (h) If the court finds that more than 1 defendant has contributed to the loss of a
> victim, the court may make each defendant liable for payment of the full amount of
> restitution or may apportion liability among the defendants to reflect the level of
> contribution to the victim's loss and economic circumstances of each defendant.
> 18 U.S.C. § 3664 (h)

The government does not currently have an estimate of the amount of damages suffered by

the media victims. The Court may adjourn resolution of the restitution amount for a period of up

to 90 days as may be appropriate. *See* 18 U.S.C. § 3664(d)(5).

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not
qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can
be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9
(D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 36 months' incarceration, 3 years of supervised release, restitution, and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      *s/Jennifer Leigh Blackwell*
Jennifer Leigh Blackwell
Assistant United States Attorney
D.C. Bar No. 481097